UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | | |
|---|---|---|
| JERRY MICULEK,<br>KAY MICULEK, AND BANG, INC.<br>        Plaintiffs | * | CIVIL NO: |
| | * | SECTION: |
| VERSUS | * | JUDGE : |
| | * | MAGISTRATE JUDGE: |
| BROCK AFENTUL<br>        Defendant | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION, PERMANENT INJUNCTION,
DECLARATORY JUDGMENT AND DAMAGES**

NOW INTO COURT, through undersigned counsel, come JERRY MICULEK, KAY MICULEK, and BANG, INC. (collectively "Plaintiffs" or "the Miculeks"), who bring suit for trademark infringement, cybersquatting, misappropriation, conversion, fraud, breach of contract, unjust enrichment, and breach of fiduciary duty arising from the actions of BROCK AFENTUL ("Defendant"). Afentul, Plaintiffs' son-in-law, abused their trust, diverted and concealed revenue from a promotional channel formed in connection with the Miculeks' business for his own personal gain, and is now holding the Miculeks' channel and promotional ability hostage while attempting to misappropriate to himself the marks associated with the Miculeks' business.   Plaintiffs' seek a Temporary Restraining Order to prevent the risk of immediate, irreparable harm created by Defendant's action, and, following that, a Preliminary Injunction, Permanent Injunction, Declaratory Judgment, damages, reasonable attorney fees, and any other relief provided by law.

## INTRODUCTION

1.      Jerry Miculek is a professional competition shooter who holds numerous world speed shooting world records and has won more than one hundred national and world shooting titles.   He has been referred to as "The Greatest Shooter of All Time"[1] and "[p]robably the best all-around shooter alive."[2]  Kay Miculek, Jerry's wife, is also a competition shooter, and has been referred to as "the winningest female shooter in history."[3]

2.      Jerry and Kay Miculek have been fixtures on the competitive shooting circuit for decades, and derive revenue from multiple sponsorships, appearances in promotional videos, talent fees for appearances in television shows, the sale of merchandise, and serving as shooting instructors.

3.      The instant suit involves an ongoing and escalating series of actions taken by Brock Afentul -- who is currently in the midst of a divorce from Jerry and Kay's daughter, Lena Miculek -- to take the Miculeks' advertising revenue as his own; to lock Jerry and Kay out of MiculekDotCom, the social media channel they use to promote their business; to use his possession of the social media channel as leverage to compel Lena Miculek to accept his divorce settlement offer; to continue marketing Miculek merchandise in competition with the Miculeks themselves; and, even after the start of his divorce proceedings, to apply for a trademark for one of the Miculeks' signature marks to prevent them from even being able to use their established emblem in connection with their branding and merchandise sales.

---

[1] http://www.outdoorchannel.com/article.aspx?id=50976.
[2] http://www.shootingtimes.com/competition/best-exhibition-shooters-time/.
[3] http://outdoorchannel.com/kay-miculek-head-instructor.

4.      Brock Afentul's actions have caused, continue to cause, and pose an immediate risk of causing, irreparable injury to Jerry and Kay Miculek and to Bang, Inc., the corporate entity owned and operated by the Miculeks.

## Parties

5.      Jerry Miculek and Kay Miculek are residents of Bossier Parish, Louisiana.

6.      Bang, Inc., is a Louisiana corporation with a principal place of business in Princeton, Louisiana, operated by the Miculek's in connection with their business dealing and merchandise sales.

7.      Brock Afentul is a resident of Bossier Parish, Louisiana.

## Venue and Jurisdiction

8.      This is an action for cybersquatting, trademark infringement, conversion, civil theft, replevin, breach of contract, unjust enrichment, breach of fiduciary duty, and declaratory judgment.  The cybersquatting and trademark infringement claims arise under the federal Lanham Act, and, constitute, respectively, violations of 15 U.S.C. § 1125(a) and 15 U.S.C. § 1125(d).

9.      The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a) and (b), and 1367.

10.     Defendant Afentul is a resident of Louisiana, and is subject to general personal jurisdiction in the state.

## Facts[4]

---

[4] See Exhibit E, Sworn Statement of Jerry Miculek.

11.     The Miculeks are prominent members of the competitive shooting community, and earn income through winning competitions, obtaining sponsorships, serving as shooting instructors, appearing on television shows, and directly selling various types of merchandise.

12.     In connection with their promotional activities and merchandise sales, the Miculeks operate a website, http://www.miculek.com, through which they promote their sponsors and sell various products, including signature revolver grips and instructional DVDs.

13.     The Miculeks also rely on various social media platforms to distribute video content, promote their sponsors, sell merchandise, and drive traffic to their website.  These social media platforms include, among other things, a Facebook page devoted to Jerry Miculek, a Facebook page titled Team Miculek Competition Shooting, a verified [5] Youtube channel titled MiculekDotCom,[6]  The MiculekDotCom Youtube channel, specifically, has more than 670,000 subscribers, has attracted more than 90 million page views, and features paid, third-party advertisements.

14.     Jerry and Kay Miculek have a daughter, Lena Miculek, who is also a competitive shooter. Lena Miculek married Brock Afentul, who, prior to 2013-2014, worked as a salesperon at a retail location of a large national consumer electronics corporation (Best Buy) and was in no way affiliated with competitive shooting or the competitive shooting industry.

15.     From 2013 to 2016 the Miculeks allowed their son-in-law, Brock Afentul, to assist them part-time in the production of videos featuring various shooting feats, and to manage the Youtube channel on their behalf.  At Afentul's request, the Miculeks even purchased an approximately

---

[5] The YouTube support page indicates that a "verified" account "means that the channel belongs to an established creator or is the official channel of a brand, business, or organization." (https://support.google.com/youtube/answer/3046484?hl=en).
[6] https://www.youtube.com/user/MiculekDotCom.

$45,000 high speed camera to increase video quality, and provided the resources necessary to make the channel a viable promotional platform.[7]

16.      In his capacity as the manager of the Youtube channel, Afentul maintained all passwords for the account, and also agreed to inform the Miculeks when and if the account began generating a steady cash flow.  The Miculeks agreed to pay Afentul a reasonable percentage of the account revenue for his efforts on their behalf.  Rather than commit to a specific number at the outset, the parties agreed that they would meet to discuss the exact amount of Afentul's salary when he reported back to them on revenue.

17.      The content on the MiculekDotCom almost exclusively consisted of videos of Jerry Miculek performing speed shooting tasks, making extremely difficult shots, providing gun reviews, etc.  Jerry spent thousands of hours on the range and in the field to generate the content needed to fill the 200+ videos uploaded to the channel from 2013 to 2016.   As Jerry's fans became aware of the channel, traffic to MiculekDotCom increased, with videos receiving millions of views and the, and the "subscriber" list increased substantially.

18.       From 2013 to 2016, more than 200 videos were added to the site.  Jerry spent thousands of hours on the shooting range creating the content for the videos, with each video taking approximately two days out of his schedule.

19.      The parties understood that Afentul was helping create these videos on behalf of the Miculeks, and that the Miculeks would generate profit from and retain control over use of the videos and the YouTube channel.  Jerry Miculek did not charge for his time or assess his standard $2,500 per day talent fee because he always expected to profit from this venture.

---

[7] See Exhibit B, Camera Receipt.

20.     However, despite the extraordinary numbers of page views and subscribers to the channel, Afentul repeatedly informed the Miculeks that the YouTube channel was not generating any significant revenue and was just barely breaking even. Afentul also resisted any and all efforts by the Miculeks to obtain access to the account's financial records.

21.     Initially, the Miculeks trusted their son-in-law, and, not having substantial experience regarding amounts generated from social media advertising, believed his representations that the account was not generating substantial revenue. The Miculeks even believed Afentul when he subsequently came back to them, and said that he needed to start selling Miculek-branded t-shirts to support the channel's lack of revenue.

22.     All told, from 2013 to the present day, the Miculeks have not received any revenue whatsoever from the channel bearing their name, the t-shirt sales, or any other effort by Afentul to market the Miculek's name and likeness, when, based on information and belief, said revenue could be in excess of $200,000 per year.

23.     Based on information and belief, as the videos began generating substantial traffic, Afentul began collecting direct advertising revenue from YouTube, and also entered into a third-party advertising contract upon behalf of the Miculeks.

24.     Afentul never disclosed the revenue generated by the MiculekDotCom channel to the Miculeks. Upon information and belief, Afentul took the revenue for himself and converted it to his own use.

26.     In the summer of 2016, Afentul's relationship with Lena Miculek began to deteriorate, and the Miculeks asked Afentul for the financial records relating to the YouTube channel and the t-shirt sales. Afentul refused to produce any of these records despite repeated requests.

27.     In July of 2016, Afentul stopped working on behalf of the Miculeks, but did not turn over the password and management of the MiculekDotCom channel, or the videos featuring Jerry Miculek.

28.     Upon information and belief, Afentul continues to collect advertising revenue from the channel.  Afentul's actions lead viewers and advertisers to believe the site was still being operated on behalf of the Miculeks.

29.     Afentul also continues to sell t-shirts branded with the Miculek name, represents that he is acting on behalf of the Miculeks in selling said t-shirts and improperly retained all revenue generated from t-shirt sales.

30.     Afentul, who is now involved in divorce proceedings with the Miculeks' daughter, Lena, completely locked the Miculeks out of their own Youtube channel.  Afentul also informed the Miculeks that, if they want their channel and content back, they should urge their daughter to agree to Afentul's divorce settlement offer quickly AND Jerry Miculek should pay him a yet-to-be-determined sum of money.

31.     Afentul is also actively attempting to license a mark associated directly with the Miculeks. The Miculeks use a signature mark, an "M" placed inside of gun sights, in connection with their merchandise sales, and, as shown below, brand their website as "Team Miculek" with the mark used as the first letter in their last name.



32.     On February 20, 2017, after the initiation of divorce proceedings, Afentul filed a trademark application to register the signature mark – the "M" inside of gunsights – that the Miculeks' use in place of the standard letter "M" in their last name in connection with their website and merchandise sales.[8]  At that time, Afentul was estranged from the family, and had no authority to conduct any business upon their behalf.  Based on information and belief, Afentul further listed Lena Miculek as a co-applicant on the trademark application in hopes of reducing scrutiny regarding his attempt to register a mark that is connection with the Miculek last name.

33.     In order to satisfy the "actually in use" prong necessary to obtain a trademark, Afentul, in his attempt to take the mark for himself, even included pictures of the Miculeks' website and their merchandise as evidence that the mark was being used in connection with the sale of commercial goods.[9]

---

[8] See Exhibit A, Trademark Application and Review
[9] Id.

8

34.     In seeking to appropriate the "M" brand of the Miculeks' to himself, and Afentul listed in his application that the mark would be used in the marketing and sale of gun merchandise – the Miculeks' core business.

35.     On May 10, 2017, the trademark office temporarily denied Afentul's requesting pending a amended application because the reviewing attorney determined that, while Afentul was applying for the "M" in gun sights trademark, the "actual use" submissions he presented showed the mark as a larger design – the "Team Miculek" mark shown on www.miculek.com.   The Trademark office, however, provided Afentul with a six-month window within which to amend his application, and, based on information and belief, Afentul continues to actively pursue the registration of the mark in his name.[10]

36.     Brock Afentul abused the trust placed in him by the Miculeks, took their revenue as his own, locked them out of one of their primary promotional vehicles, and now seeks to: 1) use the MiculekDotCom channel to exert pressure in the divorce proceeding; and 2) take the signature mark used by the Miculeks as his own; while still, 3) actively selling t-shirts branded with the Miculek name and collecting the revenue generated from the Miculeks' Youtube channel.

37.     The Miculeks inability to post content on MiculekDotCom has cost them, and continues to cost them, multiple opportunities to acquire new sponsors, build their brand, and interact with their loyal customers; Afentul's active, ongoing attempt to misappropriate the Miculeks signature mark threatens immediate, irreparable harm to their name, brand, and merchandise sales efforts; and, Afentul's possession of the hundreds of videos starring Jerry Miculek poses an immediate risk that he will delete, alter, or transfer ownership to a third party if the Miculeks – or their daughter – fail to comply with Afentul's demand for payment.

---

[10] Id.

38.    Upon information and belief, Defendant, as an apparent agent of the Miculeks, also has the ability to cancel, renew, or modify terms of advertising  agreements relating to the channel to the determinant of the Plaintiffs.

39.    While retaining control over the Miculeks' channel and continuing to sell merchandise branded with their name or likeness, Afentul also began posting comments about the Miculeks and their daughter, Lena, on the www.reddit.com social media site under the username "Ramphastid556."[11]

    A.  The posts include references to:

- The Miculeks' prominent place in the competitive shooting community;

- Afentul's role in assisting the Miculeks with videos and the YouTube channel;

- Afentul's purported belief that the Miculeks' place in the local and/or competitive shooting community would disadvantage him in his divorce proceedings;

- Allegations that Lena Miculek suffers from "Sociopathic qualities" and statements that Afentul does not want to be around "when she does snap and her job includes handling firearms";

- A graphic description of an episode in which Afentul alleges that the Miculeks' daughter made comments expressing a desire that Afentul commit suicide by self-inflicted gunshot wound.

    B.  While the aforementioned posts do not specifically reference the Miculeks by name, the posts describe the identity of the Miculeks, and the posts were readily associated with the Miculeks because Afentul had previously used the "Ramphastid556"

---

[11] See Exhibit C, Brock Afentul's Reddit Posts.

username promote videos of Jerry Miculek posted on the YouTube Channel.  As a result, the Miculeks began receiving correspondence expressing concern about the posts.

C. Posts, such as these, written by someone who still retains control over one of the Miculeks' promotional channels, linking the Miculeks to instability and gun violence are toxic to the Miculeks brand and create an immediate risk of irreparable harm to the Miculeks ability to generate revenue for television appearances and as representatives of various product lines associated with guns and competitive shooting.

40.     Afentul's posts represent only the tip of the iceberg of irreparable harm Afentul, through his continued control of their YouTube channel and videos, could cause the Miculeks at any time.

41.     In the absence of immediate injunctive relief, Defendant has the ability to irreparably damage Plaintiffs' name, brand, and reputation by posting negative content on the site the public believes is being operated by the Miculeks if, for example:  A) the Miculeks and their daughter do not accede to Defendant's June 17, 2017,[12] demand for a favorable divorce settlement agreement; B) the Miculeks do not accede to Defendant's ancillary June 17, 2017 demand for a separate, post-divorce payment for the channel and videos; or, C) the Miculeks, through a legal proceeding such as the instant suit, attempt to exercise their rights to control the channel and content containing their names and built on their likeness.

42.     Plaintiffs are entitled to a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction requiring that Defendant refrain from:

- Applying to register the marks used by the Miculek's as his trademark;

---

[12] See Exhibit D, Brock Afentul's Text Message Exchange.

- Deleting or making any modifications to MiculekDotCom channel and/or any material or videos posted therein;

- Selling merchandise featuring the Plaintiffs' name, brand, or likeness; and,

- Modifying or cancelling any advertising contracts or agreements linked to MiculekDotCom.

Plaintiffs are further entitled to an order providing that:

- Afentul hand over control of MiculekDotCom and the videos posted therein to Jerry and Kay Miculek; and,

- Place any and all new revenue generated by the Youtube channel and/or the sale of t-shirts or other Miculek merchandise into an escrow account pending a full resolution of this matter.

### Count One: Cybersquatting in Violation of Section 43(d) of the Lanham Act

43.    The Miculek name and related marks is known to, and famous within, the competive gun shooting and gun merchandise sales communities.

44.    The Miculeks use their name in connection with their achievements, sponsors, and potential customers.   The Miculeks also operate www.miculek.com to facilitate the sale of products, to generate additional exposure for their sponsors, and to interact with their supporters.

45.    Brock Afentul, despite no longer being affiliated with Jerry and Kay Miculek, continues to exercise domain and control over, and to collect revenue from the MiculekDotCom Youtube channel.  Afentul also continues to utilize the channel in an effort to sell more Miculek-branded shirts and memorabilia without the consent of of the Miculeks.

46.    The MiculekDotCom channel is directly affiliated with the Miculek family, and is the same or substantially similar to the www.miculek.com site operated by the Miculeks.

47.     Defendant Afentul violated Section 43(d) of the Lanham Act by trafficking in and using the MiculekDotCom Youtube channel with a bad faith intent to profit from the fame and recognizability of the Miculek name.  Afentul further demonstrated his bad faith in this matter by: refusing to produce even basic records to the Miculeks; attempting to make the Miculeks pay him for the return of their channel; attempting to use the channel as leverage over Jerry Miculek, and Jerry's daughter Lena, in hopes of coercing Lena to accept his settlement demands in their divorce proceeding; and, even after he was no longer affiliated with the Miculeks' business, attempting to register for himself the mark featured on the www.miculek.com and used by the Miculeks in connection with the sale of merchandise.

48.     Plaintiffs are entitled to all damages incurred by Afentul's "cybersquatting" actions, the full value of all profits Afentul collected from his actions, and the costs of bringing this suit. Given the truly exceptional nature of this action, Defendant's continued efforts to block Plaintiffs from their site, and Defendant's additional attempt to wrest the gun-sight-bracketed "M" in "Miculek" from the Miculeks, Plaintiffs are also entitled to treble damages and reasonable attorneys fees.[13] Further, Plaintiffs are entitled to a judicial order transferring the YouTube channel and the content posted thereon back to Jerry and Kay Miculek pursuant to 15 U.S.C. §1125(C), as well as any and all other available equitable relief.

**Count Two: Trademark Infringement Under Section 43(A) of the Lanham Act.**

49.     Defendant Afentul also violated Section 43(A) of the Lanham Act by accepting advertising and promotional payment for services rendered by and through the MiculekDotCom channel, and by selling Miculek-branded merchandise even after his disaffiliation from the business.

---

[13] 15 U.S.C. § 1117.

50.    Section 43(A) of the Lanham Act provides protection to names and famous marks, even if such marks have not been registered with the Patent and Trademark Office.[14]

51.    The Miculek name has been established within the competition shooting and gun enthusiast community for decades – long before Defendant began providing technical and administrative support to Jerry and Kay Miculek.

52.    Defendant, in selling Miculek-branded products following his removal from the Miculeks business, increased the likelihood of customer confusion, and falsely represented that he acted on behalf of and with the consent of the Miculeks.

53.    Further, Defendant, in collecting revenues from the Miculeks verified Youtube account, and by de facto representing that the Miculeks were still in control of and actively affiliated with the account, diluted the Miculek brand, took for his own revenue generated in the Miculeks name, increased the likelihood of customer confusion, and directly profited from his action.

54.    Plaintiffs are entitled to all damages incurred by Defendant Afentul's violation of Section 43(A) of the Lanham Act, treble damages pursuant to 15 U.S.C.A. § 1117, all lost profits resulting from Afentul's actions, court costs, injunctive relief, reasonable attorney fees, and any other relief allowed by law.

## Count Three: Fraud

55.    Plaintiffs incorporate the above allegations.

56.    Defendant Afentul agreed to assist the Miculeks in the production of videos, and to manage the MiculekDotCom channel on their behalf.

---

[14] 15 U.S.C. § 1125.

14

57.    Defendant Afentul, as the Plaintiffs' son-in-law, was in position of trust and confidence, and they relied on his representations regarding the status of, and revenue generated by, said channel.

58.    Based on information and belief, Defendant, in connection with his management of MiculekDotCom on behalf of the Plaintiffs from 2013 until July of 2016, intentionally misrepresented and understated the amount of advertising revenue generated by said channel.

59.    Defendant further relied upon his position of trust to avoid Plaintiffs' requests that he produce documents and information relating to the site – and to avoid Plaintiffs' discovery of his misrepresentations.

60.    Defendant thus prevented Plaintiffs from realizing the amount of revenue generated by the channel, and, based on information and belief, converted said revenue to his personal use.

61.    Plaintiffs are entitled to all damages caused by Defendant Afentul's fraudulent representations and omission, including, as well as reasonable atttorney fees, and any other relief allowed by law.

### Count Four: Appropriation of Name or Likeness.

62.    Plaintiffs incorporate the above allegations.

63.    Defendant Afentul used, and continues to use, the name and likeness of the Plaintiffs' for his personal benefit.  In so doing, Afentul has infringed upon Plaintiffs right to privacy and publicity.

64.    Defendant Afentul continued to both operate the MiculekDotCom channel and to sell merchandise branded with the Miculek name and/or likeness even after he was no longer affiliated with the Miculeks' business, advertising, or promotional activities.

65.    Based on information and belief, Afentul derived substantial revenue from these activities.

66.     Afentul also seeks to profit from his appropriation of the Miculeks' name by refusing to stop his continued appropriation of their name and likeness unless the Miculeks agree to pay him to stop said actions.

67.     Afentul's action have deprived Plaintiffs of revenue, and diluted their name, brand and reputation.  Plaintiffs are entitled to damages, an order instructing Afentul to cease his wrongful appropriation of their name and likeness, and any other relief provided by law.

### Count Five: Conversion

68.     Plaintiffs incorporate the above allegations.

69.     Defendant Afentul operated MiculekDotCom on the Miculek's behalf from 2013 until July of 2016.   In this capacity, Afentul was entrusted both with operating the channel, and with maintaining the videos he posted therein.

70.     When Afentul stopped managing the channel in July of 2016, Afentul retained the password for, and control of, the channel and videos.

71.     Afentul ignored these requests, and neither turned over control of the channel to the Afentul's nor provided them with the original copies of the videos he uploaded to the channel on their behalf.

72.     Instead, Afentul maintained control of both the channel and the videos, and, based on information and belief, continued to collect advertising review generated by same.

73.     From to July of 2016 until the present time, Afentul has continued to retain control over the channel, and to refuse requests to meet with the Miculeks regarding the channel and the videos – instead, demanding as recently as June 17, 2017, that the Plaintiffs pay him to relinquish their property to their control.

74.     Plaintiffs are entitled to all damages incurred by Defendant Afentul's conversion of MiculekDotCom, the original copies of the videos posted to the channel, and  the revenue generated by same.  Plaintiffs are further entitled to have both control of the channel and the videos returned to them forthwith, as well as any other relief allowed by law.

### Count Six: Breach of Contract

75.     Plaintiffs incorporate the above allegations.

76.     In 2013, Defendant entered into an oral contract to manage MiculekDotCom on Plaintiffs' behalf and to assist them in producing videos for the general public.  Defendant and agreed to apprise Plaintiffs when the site started generating positive revenue, the parties understood that the Miculeks would retain control over the videos and channel.  The parties further agreed that, when Afentul reported back that the channel was generating positive revenue, that they would review said revenue to determine the specific percentage of the revenue to be paid to Afentul as compensation going forward.

77.     Defendant subsequently breached the agreement by failing to properly notify Plaintiffs regarding the revenue generated by the channel, affirmatively misrepresenting the amount of revenue generated, and retaining control over the video and channel even after he was no longer affiliated with the Plaintiffs' business.

78.     Based on information and belief, Defendant then kept for himself the revenue generated by the site, and maintained possession of the videos posted therein.   To date, Plaintiffs have not received any of the revenue from the channel bearing their name, nor compensation for the extensive work they undertook in providing the content posted to the channel.

79.      Plaintiffs are entitled to all damages resulting Afentul's breach on contract, and any other remedy allowed by law.

## Count Seven: Breach of Fiduciary Duty

80.     Plaintiffs incorporate the above allegations.

81.     Louisiana courts recognize that " 'The **employee** is duty bound not to act in antagonism or opposition to the interest of the **employer. Every one,** whether designated **agent,** trustee, **servant, or what not, who is under contract or** other legal obligation to represent or act for another in any particular business or line of business or for any valuable **purpose, must be loyal and faithful to the interest of such other in respect to such business or purpose. He cannot lawfully serve or acquire any private interest of his own in opposition to it.** This is a rule of common sense and honesty as well as of law.   *ODECO Oil & Gas Co. v. Nunez*, 532 So.2d 453, 462 (La. App. 1 Cir. 1988) (internal citation omitted), *writ denied*, 535 So.2d 745 (La.1989).

82.     Defendant Afentul, in making misrepresentations to the Miculeks' regarding the amount of revenue generated by MiculekDotCom, in refusing to relinquish the videos entrusted to his care, and in demanding that the Plaintiffs pay him to relinquish control over their property clearly breached his fiduciary duty to Plaintiffs in this matter.

83.     Plaintiffs are entitled to the damages occasioned by this breach, and any other relief allowed by law.

## Count Eight: Unjust Enrichment

84.     Plaintiffs incorporate the above allegations.

85.     Defendant Afentul, in benefiting from the extensive time and effort undertaken by Plaintiffs in the creation of the video content used on MiculekDotCom, and in keeping for himself the revenue generated by said videos, was unjustly enriched at Plaintiffs' expense.

86.     To the extent that such damages are not collectible under the other theories of recovery enumerated above, the Miculeks are entitled to just compensation for providing their time, effort, name, and likeness to the YouTube channel and the videos posted therein.

## Jury Demand

87.     Plaintiffs demand a trial by jury.

### Bond for Injunctive Relief

88.     To the extent required by Federal Rule of Civil Procedure 65, the Miculeks are willing to post a bond in connection with any temporary or preliminary injunctive relief in this matter. However, given their high likelihood of success on the merits, and their request that all revenue from the promotional channel and merchandise in question be placed in escrow during the pendency of this suit, the Miculeks represent that only a nominal bond is appropriate.

### Request for Relief

WHEREFORE, Plaintiffs, Kay and Jerry Miculek, pray that this this Court:

1. Enter an Order in Favor of Plaintiffs on their claims against Defendants;

2. Enter a temporary restraining order, preliminary injunction, and permanent injuction requiring that Defendant:

    A) Refrain from applying to register trademarks for the marks used by the Miculeks;

    B) Refrain from deleting or making any modifications to MiculekDotCom channel and/or any material or videos posted therein;

      C)  Refrain from selling merchandise featuring the Plaintiffs' name, brand, or likeness; and,

      D)  Refrain from modifying or cancelling any advertising contracts or agreements linked to MiculekDotCom;

      E)  Hand over control of MiculekDotCom to Jerry and Kay Miculek;

      F)  Return original copies of the videos featured on the MiculekDotCom channel to the Miculeks; and,

      G)  Place any and all new revenue generated by the Youtube channel and/or the sale of t-shirts or other Miculek merchandise into an escrow account pending a full resolution of this matter.

3.  Declare that Jerry and Kay Miculek are the owners of the MiculekDotCom channel, and the videos posted therein;

4.  Enter an Order in favor of Plaintiffs and against Defendant for all damages in an amount to be determined at trial, and any applicable interest;

5.  Declare this case exceptional under 15 U.S.C. §1117.

6.  Enter an Order in favor of Plaintiffs and against Defendant for all Plaintiffs' attorney's fees, costs and expenses incurred herein;

7.  Enter an Order for any such other and further relief as allow be law or determined to be just and appropriate.

PETTIETTE, ARMAND, DUNKELMAN,
WOODLEY, BYRD & CROMWELL, L.L.P.

_____

Donald Armand, Jr. #17444
Zachary A. Wilkes  #36730

400 Texas Street, Suite 400 (71101)
Post Office Box 1786
Shreveport, LA   71166-1786
Ph. (318) 221-1800     Fax (318) 226-0390
Email:  darmand@padwbc.com
            zwilkes@padwbc.com


ATTORNEYS  FOR  JERRY  MICULEK,  KAY
MICULEK, AND BANG, INC.